**The below described is SIGNED.**

**Dated: May 14, 2008**   _____
**GLEN E. CLARK**
**U.S. Bankruptcy Judge**



_____

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF UTAH

_____

| | |
|---|---|
| In re | ) |
| | ) |
| GENEVA STEEL LLC, GENEVA STEEL HOLDINGS CORP., IRON ORE MINES, LLC, and WILLIAMS FARM LLC, | ) Bankruptcy Case No. 02-35387 |
| | ) Jointly Administered in Case 02-35385 |
| Debtors | ) |
| | ) Chapter 11 |
| _____ | ) |
| JAMES T. MARKUS, Chapter 11 Trustee of GENEVA STEEL LLC, GENEVA STEEL HOLDINGS CORP., IRON ORE MINES, LLC, and WILLIAMS FARM LLC | ) Adversary Proceeding No. 05 - 02578 |
| Plaintiff, | ) STATEMENT OF UNDISPUTED |
| | ) FACTS, ANALYSIS and |
| | ) CONCLUSIONS OF LAW |
| v. | ) REGARDING CROSS MOTIONS |
| | ) for SUMMARY JUDGMENT |
| ALBERT FRIED, JR., ALBERT FRIED & CO., STEELMAN, INC., a Delaware corporation. | ) |
| Defendants. | ) |

_____

The motion of Albert Fried, Jr., Albert Fried & Co., LLC and Steelman, Inc. (the

"Defendants") and the cross-motion of James T. Markus, the Chapter 11 Trustee of Geneva

Steel, LLC, Geneva Steel Holdings Corp., Iron Ore Mines, LLC and Williams Farm LLC ("Markus") came before the Court on April 8, 2008.  David J. Jordan, Danny C. Kelly, and Mark E. Hindley of Stoel Rives LLP appeared on behalf of Albert Fried, Jr. and Albert Fried & Co., Jason Boren of Ballard Spahr, Andrews & Ingersoll, LLP appeared on behalf of Kay Scholer, Nora Brunelle of Fabian & Clendenin, P.C. appeared on behalf of Steelman, James Marcus and Steven R. Rider, of Block, Markus & Williams, and Steven T. Waterman of Ray Quinney & Nebeker P.C. appeared on behalf of Markus.

Markus and the Defendants have filed cross motions for summary judgment with respect to the statute of limitations affecting this adversary proceeding which seeks to avoid the transfer of land known as the Williams Farm Property ("Williams Farm Property") to Steelman, Inc.  The transfer of the Williams Farm Property from WFLLC to Steelman, Inc. took place on or around May 23, 2002.  The Williams Farm LLC bankruptcy proceeding was filed on September 13, 2002., and this adversary proceeding was commenced by Markus on September 16, 2005.  Unless equitable tolling applies, an adversary proceeding such as this would be barred by the statute of limitation found under 11 U.S.C. § 546(a)(1), or by state law as the case may be.  Markus argues that equitable tolling should apply because of nondisclosure and misleading information that obscured discovery of the details surrounding the transfer of the Williams Farm Property from creditors of the Williams Farm LLC bankruptcy proceeding.  Defendants argue that creditors of the Williams Farm Property LLC bankruptcy proceeding had sufficient information available to put them on notice of the transfer of the Williams Farm Property.

The following facts have been identified in the pleadings filed in support or opposition to summary judgment as undisputed facts and have not been disputed or contested by the opposing party.

## UNDISPUTED FACTS

1. On February 1, 1999, Geneva Steel Company filed Chapter 11 bankruptcy case no. 99-21130, ( "Geneva I").

2. Albert Fried served as co-chair of the Official Bondholders Committee in the Geneva I bankruptcy proceeding.

3. Among other assets, Geneva I owned approximately 76 acres of real property known as the Williams Farm Property.

4. The Geneva I Plan provided for the creation of a single-purpose wholly owned subsidiary known as Williams Farm LLC ("WFLLC").

5. The Geneva I Plan provided for the transfer of the Williams Farm Property to WFLLC on the effective date of the plan.

6. On November 20, 2000, prior to plan confirmation, Albert Fried & Co. ("AFCO") committed in writing to provide exit funding for Geneva I (the "Commitment to Fund").

7. Albert Fried, Jr. is the managing member of AFCO.

8. The Commitment to Fund was incorporated into the Geneva I plan of reorganization and consisted of a 9.8 million dollar loan referred to in the plan as the "Tranche C Exit Financing".

9. The Commitment to Fund provided for a principal amount, a coupon amount, financing fees, and the representation that all other terms of the loan would be the same as presently drafted.

10. There was no option included within the Commitment to Fund, and in particular, there was no option for the sale of the Williams Farm Property.

11. On November 21, 2000, the Court confirmed the Geneva I plan as proposed. The Order of Confirmation was entered on December 8, 2000.

12. A letter concerning the Tranche C Exit Financing that purports to grant an option to AFCO for the purchase of the Williams Farm Property was signed by Albert Fried on January 3, 2001 (the "January 3, 2001 Letter").

13. The January 3, 2001 letter was not disclosed to the Bankruptcy Court or to the Geneva I bankruptcy creditors.

14. On January 3, 2001, AFCO funded the Tranche C Exit Financing.

15. On January 3, 2001, Geneva Steel Holdings Corp. was created pursuant to the terms of the Geneva I plan.

16. All of the assets of Geneva I were transferred into Geneva Steel Holdings Corp.

17. Albert Fried served as a member of the Board of Directors of Geneva Steel Holdings Corp. from the date of its creation until January of 2003.

18. Between January 2001 and January 2002, AFCO acquired additional shares of Geneva Steel Holdings Corp. stock which brought AFCO's ownership interest to approximately 31% of common stock in Geneva Steel Holdings Corp.

19. On January 3, 2001, WFLLC was created.

20. WFLLC is wholly owned by Geneva Steel Holdings Corp..

21. The Williams Farm Property was transferred to WFLLC pursuant to the terms of the Geneva I plan.

22. On May 2, 2001, Ken Johnsen ("Johnsen"), Geneva I's executive vice president, and the President and CEO of Geneva Steel Holdings Corp., signed an Option Agreement dated January 3, 2001, that purports to grant AFCO an option to purchase the Williams Farm Property (the "Option Agreement").

23. The Option Agreement provided for a purchase price of $1,000,000.00.

24. The Option Agreement was recorded with the Utah County Recorder on May 15, 2001.

25. The Option Agreement did not disclose the estimated value of the land to be purchased for a price of $1,000,000.00.

26. The Option Agreement describes an "Option Event" consisting of two requirements which must be met before the buyer may exercise the Option Agreement. The two requirements necessary to trigger the Option Event are: 1) one year has elapsed from the initial funding date, and 2) the closing price per share of the common stock of Geneva Steel Holdings Corp. falls below $3.00 for at least (a) five (5) consecutive trading days, or (b) five (5) trading days out of ten (10) consecutive trading days.

27. Paragraph 4.3 of the Option Agreement provides for the automatic termination of the Option Agreement (the "Automatic Termination Provision"). Paragraph 4.3 states, in part, that if "Seller does not receive a Notice of Exercise after the Option Event but before the expiration of the Option Term, the Option shall automatically terminate as to and all of Buyer's rights hereunder shall cease with respect thereto..."

28. On August 14, 2001, the Geneva Steel Holdings Corp. Board of Directors, at a board meeting, approved an option reduction from $1,000,000.00 to $781,369.00 for AFCO.

29. On September 17, 2001, the Geneva Steel Holdings Board of Directors declared the option price to be $218,630.00 based upon the August 14, 2001 resolution.

30. On January 25, 2002, Geneva Steel LLC ("GSL") filed for Chapter 11 bankruptcy relief.

31. On April 23, 2002, the Option Agreement price was reduced another time. This time the option price was reduced to $76,000.00.

32. Prior to April 30, 2002, WFLLC owned only one asset of significant value - the Williams Farm Property.

33. In April 2002, AFCO transferred all of its rights in the Option Agreement to Steelman Inc. ("Steelman").

34. Steelman is a 100% wholly owned subsidiary of AFCO.

35. On or about April 30, 2002, Steelman paid $76,777.40 to WFLLC in order to exercise the Option Agreement to purchase the Williams Farm Property.

36. On May 8, 2002, an appraisal determined the Williams Farm Property to be worth $6,128,000.00.

37. A special warranty deed transferring the Williams Farm Property from WFLLC to Steelman was recorded May 23, 2002.

38. On September 13, 2002, WFLLC filed Chapter 11 bankruptcy case number 02-35387.

39. Steve Garcia was appointed bankruptcy counsel in the WFLLC bankruptcy proceeding.

40. Without equitable tolling, the September 13, 2002 petition date would have caused the limitation period under § 546(a)(1)(A) to run on September 13, 2004.

41. On the petition date, WFLLC was, in essence, a bankruptcy proceeding which owned only two assets - $76,000.00 cash, and a claim to recover the Williams Farm Property which was transferred approximately 4 months prior to the petition date.

42. On September 16, 2002, an order was entered directing the joint administration of the WFLLC with five other related bankruptcy proceedings. The joint administration order directed that pleadings be filed in Case 02-35385.

43. On October 28, 2002, WFLLC filed its bankruptcy Schedules and Statements of Financial Affairs.

44. The only creditors named in the WFLLC's bankruptcy proceeding were Atlas Sales, Inc., the Internal Revenue Service, the Utah State Tax Commission and the Pension Benefit Guarantee Corporation.

45. The transfer of the Williams Farm Property to Steelman was not disclosed anywhere in WFLLC's original bankruptcy Schedules and Statement of Financial Affairs.

46. WFLLC's Statement of Financial Affairs states the word "none" in response to question #10 - Other Transfers, which requires the debtor to list all property, other than property transferred in the ordinary course of business, transferred within two years immediately preceding the commencement of the bankruptcy case.

47. The failure to disclose the transfer of the Williams Farm Property in WFLLC's bankruptcy Schedules and Statement of Financial Affairs is a material omission.

48. On December 13, 2002, WFLLC filed its Initial Financial Report ("Initial Financial Report") in its bankruptcy proceeding.

49. WFLLC's Initial Financial Report included the following attachments:

    a.    A Form 10-K filed with the Securities and Exchange Commission ("SEC") by Geneva Steel Holdings Corp. for the fiscal year ended September 30, 2000.

    b.    A Form 10-Q filed with the SEC by Geneva Steel Holdings Corp. for the quarterly period ended September 30, 2001.

    c.    A Form 10-Q filed with the SEC by Geneva Steel Holdings Corp. for the quarterly period ended June 30, 2001.

    d.    A Form 10-Q filed with the SEC by Geneva Steel Holdings Corp. for the quarterly period ended March 31, 2001.

50.    The Initial Financial Report offers no explanation why the SEC Forms 10-K and 10-Q filed by Geneva Steel Holdings Corp., which is a separate legal entity from WFLLC, are attached to the WFLLC Initial Financial Report or how the Geneva Steel Holdings Corp. SEC filings are related to the WFLLC bankruptcy proceeding.

51.    The Form 10-Q filed by Geneva Steel Holdings Corp., for the quarterly period ended September 30, 2001 states that:

    a.    During the nine months ended September 30, 2001, in connection with the term debt financing, an option to purchase the Williams Farm Property for $218,630 became effective. The option price is estimated at 3.2 million below the fair market value of the property resulting in additional deferred loan fees related to the term debt financing.

52.    There is nothing within the Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended September 30, 2001 to indicate that an entity other than Geneva Steel Holdings Corp. was involved with the option to purchase the Williams Farm Property.

53. The Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended June 30, 2001 states that:

> During the six months ended June 30, 2001, in connection with the term debt financing, an option to purchase the Williams Farm Property for $1 million became effective. The option price is estimated at 2.4 million below the fair market value of the property resulting in additional deferred loan fees related to the term debt financing.

54. There is nothing within the Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended June 30, 2001 to indicate that an entity other than Geneva Steel Holdings Corp. was involved with the option to purchase the Williams Farm Property.

55. The Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended June 30, 2001, at page 8 of 33 refers to the property transferred to WFLLC as "certain real property" and not as "Williams Farm Property" despite the fact that the term "Williams Farm Property" is used in the preceding page of the Form 10-Q.

56. The Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended March 31, 2001 states that:

> During the three months ended March 31, 2001, in connection with the term debt financing, an option to purchase the Williams Farm Property for $1 million became effective. The option price is estimated at 2.4 million below the fair market value of the property resulting in additional deferred loan fees related to the term debt financing.

57. There is nothing within the Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended March 31, 2001 to indicate that an entity other than Geneva Steel Holdings Corp. was involved with the option to purchase the Williams Farm Property.

58. The Form 10-Q filed by Geneva Steel Holdings Corp. for the quarterly period ended March 31, 2001, at page 7 refers to the property transferred to WFLLC as "certain real property" and not as "Williams Farm Property" despite the fact that the term "Williams Farm Property" is used in the preceding page of the Form 10-Q.

59. None of the 10-K or 10-Q Forms filed by Geneva Steel Holdings Corp. state that Williams Farm Property, LLC granted an option to sell real property to AFCO or Steelman.

60. None of the 10-K or 10-Q Forms filed by Geneva Steel Holdings Corp. state that Williams Farm Property, LLC actually sold the Williams Farm Property to Steelman approximately four months prior to its filing bankruptcy.

61. Despite being filed on December 13, 2002, the Initial Financial Report does not disclose that WFLLC actually sold the Williams Farm Property to Steelman in April of 2002.

62. Although the Initial Financial Report consists of 264 pages, the report makes no disclosure of the fact that on April 30, 2002, Steelman paid WFLLC the sum of $76,777.40 and in return WFLLC transferred property to Steelman worth as much as $6,000,000.00.

63. Despite being filed on December 13, 2002, a full eight months after the sale and transfer of the Williams Farm Property, the only information found in the Initial Financial Report concerning the Williams Farm Property was over 15 months old, it describes an option price as $213,630.00, and estimates the property value at $3,200,000.00.

64. During its Chapter 11 bankruptcy proceeding, WFLLC filed 23 separate Debtor In Possession Monthly Financial Reports. None of the Monthly Financial Reports mention

the transfer of the Williams Farm Property or describe any claim held by WFLLC for the recovery of transferred property.

65. On February 20, 2003, Steelman entered into a consulting agreement with Johnsen and Joe Cannon ("Cannon"), the Chairman of the Board of Geneva Steel Holdings Corp. The consulting agreement was drafted by Garcia.

66. The February 20, 2003 consulting agreement provided Johnsen and Cannon with a percentage of the net sales price of the sale of the Williams Farm Property upon its development and sale.

67. On May 1, 2003, WFLLC filed an adversary proceeding against Atlas Sales, Inc., wherein the complaint alleged in part that "Williams Farm has conveyed the Williams Farm Property to Steelman, Inc., a Delaware corporation, as of May 23, 2002."

68. Nowhere in the WFLLC adversary proceeding is any information disclosing or discussing the value of the Williams Farm Property conveyed to Steelman.

69. On July 28, 2003, WFLLC filed amended Schedules and Statements of Financial Affairs (the "Amended Schedules") which disclose, for the first time, that WFLLC transferred the Williams Farm Property to Steelman for $76,000.00.

70. WFLLC's Amended Schedules were not mailed or sent to any of WFLLC's creditors.

71. Although the Amended Schedules disclosed that $76,000.00 was paid by Steelman to WFLLC to purchase the Williams Farm Property, the Amended Schedules did not disclose the value of the property sold to Steelman.

72. WFLLC's Amended Statement of Financial Affairs at statement #10 states that there was "no relationship" between Steelman and WFLLC.

73. AFCO is an approximate 31% shareholder of Geneva Steel Holdings Corp.

74. Geneva Steel Holdings Corp. is the 100% owner of WFLLC.

75. Garcia, Johnsen, Cannon and Fried were business associates and partners in two business ventures involving the development of condominiums near the Geneva Steel site. None of the business relationships between these individuals were disclosed to creditors of WFLLC before February 24, 2005, the date on which an examiner was appointed in the Geneva Steel LLC bankruptcy proceeding.

76. No unsecured creditor's committee was ever formed in the WFLLC bankruptcy proceeding.

77. On September 13, 2004, Johnsen testified before the Court indicating that "I am working with someone who bought Williams Farm in helping them get that sold." When Johnsen was asked about his commission, Garcia, counsel for GSL and WFLLC, objected on the grounds of relevance.

78. On October 24, 2004, DRHL, Inc., a Delaware Corporation, offered to purchase 42 acres of the 76 acres of Williams Farm Property for the sum of $8,400,000.00.

79. On November 5, 2004, WFLLC filed a motion to voluntarily dismiss its own bankruptcy proceeding arguing that it had no significant creditors and no assets other than $73,500.00 cash. The Court granted the motion to dismiss on December 9, 2004.

80. On April 12, 2005, GSL, the Official Committee of Unsecured Creditors in the GSL case, the United States on behalf of the Emergency Steel Loan Guaranty Board, and the United States Trustee filed a joint motion for appointment of a trustee in the GSL case, and on June 23, 2005, James Markus was appointed as Chapter 11 Trustee in the GSL case.

81. At an initial interview conducted by Markus, Johnsen told Markus that the transfer of the Williams Farm Property to Steelman had been approved by the bankruptcy Court as a part of the Geneva I bankruptcy proceeding.

82. The transfer of the Williams Farm Property to Steelman had never been approved by the bankruptcy Court as a part of the Geneva I bankruptcy proceeding.

83. On September 9, 2005, Markus filed an emergency motion to vacate the dismissal order of the WFLLC case, and on September 15, 2005, the Court granted the motion to vacate dismissal order.

84. On September 16, 2005, Markus was appointed Chapter 11 Trustee of the WFLLC case and on that same day Markus filed this adversary proceeding to avoid the Williams Farm Property transfer.

85. The board of directors of GSL and Geneva Steel Holdings Corp. had knowledge of the option, but the board of directors of GSL and Geneva Steel Holdings Corp. were not creditors in the WFLLC bankruptcy proceeding.

86. At some point in time, members of the Official Unsecured Creditors Committee appointed in the Geneva Holdings Corp. bankruptcy proceeding were provided with information about the Williams Farm Property transfer; however, none of the members of the Official Unsecured Creditors Committee appointed in the Geneva Holdings Corp. bankruptcy proceeding were creditors in the WFLLC bankruptcy proceeding.

ANALYSIS

Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. The evidence is to be viewed and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. However, the mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue of material fact. For a genuine issue of material fact to exist, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant. Johnson v. City of Lindon, 405 F.3d 1065 (10th Cir. 2005).

> As a court of equity, bankruptcy courts may equitably toll limitations period.
>
> It is hornbook law that limitations periods are customarily subject to 'equitable tolling,' unless tolling would be "inconsistent with the text of the relevant statute". Congress must be presumed to draft limitations periods in light of this background principle. That is doubly true when it is enacting limitations periods to be applied by bankruptcy courts, which are courts of equity and "appl[y] the principles and rules of equity jurisprudence."

Young v. United States, 535 U.S. 43, 49-50; 122 S.Ct. 1036 (2002)(citations omitted).

Unless equitable tolled, the two-year limitation period under § 546(a)(1)(A) begins running upon entry of the order for relief in the bankruptcy, and expires unless a trustee is appointed or elected before the expiration of the two year period. If a trustee is appointed or elected within the two-year period, the limitation period is extended for one year after the appointment or election of the trustee. 11 U.S.C. § 546(a). Of course, a debtor in possession is subject to the same two-year statute of limitations as an appointed trustee. Zilkha Energy Co. v. Leighton, 920 F.2d 1520, 1524 (10th Cir. 1990). Because creditors of a bankruptcy estate, with leave of court, may initiate avoiding actions to recover assets on behalf of the estate, Starzynski v. Sequoia Forest Indus., 72 F.3d 816,

821 (10th Cir. 1995), a court, when considering equitable tolling, must consider information available to the trustee as well as information available to creditors of the estate.

Defendants correctly argue that a plaintiff may not invoke the doctrine of equitable tolling without a showing of due diligence. Due diligence is measured by an objective standard. Therefore, the Court may determine, as a matter of law, whether a plaintiff discovered, or should have discovered, that the alleged fraud occurred, but nonetheless, failed to timely file suit. In re M & L Business Mach. Co., Inc., 75 F.3d 586, 591 (10th Cir. 1996).

Defendants argue that sufficient information was available to Markus and/or the creditors of WFLLC to put them on notice of the alleged fraudulent transfer to Steelman. Notice of this type is characterized as "inquiry notice" and is defined as "sufficient storm warnings to alert a reasonable person to the possibility that there were either misleading statements or significant omissions involved in the sale." Sterlin v. Biomune Systems, 154 F.3d 1191, 1196 (10th Cir. 1998) (quoting Cook v. Avien, Inc., 573 F.2d 685, 697 (1st Cir. 1978). Once a party is put on inquiry notice, the duty to exercise reasonable diligence is triggered. Even if the underlying facts of an alleged fraudulent transfer are not discovered in sufficient time to bring suit, if the underlying facts should have been discovered after the plaintiff is put on inquire notice, equitable tolling is not appropriate. Sterlin, 154 F.3d at 1201.

Given the undisputed facts of this adversary proceeding, the Court makes the following conclusions of law.

## CONCLUSIONS OF LAW

1. Because the Williams Farm Property was transferred to Steelman within four months of WFLLC's petition date, WFLLC had a duty to disclose the material terms of the transfer of the Williams Farm Property in its Schedules and Statement of Financial Affairs.

2. The failure to disclose the transfer of the Williams Farm Property in WFLLC's Schedules and Statement of Financial Affairs is a material omission.

3. Because AFCO owned, at all times relevant, at least 20% of the stock of Geneva Holdings Corp. which, in turn, owns 100% of WFLLC's stock, AFCO is an affiliate of WFLLC under 11 U.S.C. § 101(2).

4. AFCO is an insider of WFLLC under 11 U.S.C. § 101(31).

5. Because the Option Agreement does not contain information concerning the value of the property subject to the option, it lacks sufficient information to put a WFLLC creditor on inquiry notice that a fraudulent or avoidable transfer occurred or may occur.

6. Viewed in a light most favorable to Defendants, a creditor of WFLLC could interpret the Automatic Termination Provision of the Option Agreement as having terminated the Option Agreement as soon as the Option Event occurred with no purchase option exercised.

7. Geneva Steel Holdings Corp. is a separate and distinct legal entity from WFLLC.

8. For purposes of equitable tolling in a bankruptcy proceeding, due diligence does not require a creditor of a debtor corporation to comb through information filed with the SEC by a related, but nonetheless, separate and distinct corporation.

9. The information contained in Forms 10-K and 10-Q filed with the SEC by Geneva Steel Holdings Corp., a separate and distinct corporation from WFLLC, did not put creditors of WFLLC on inquiry notice.

10. Given the magnitude and importance of the transfer, WFLLC had a duty to disclose the material terms of the transfer of the Williams Farm Property to Steelman in WFLLC's Initial Financial Report.

11. WFLLC's Initial Financial Report is misleading because of the nondisclosure of information that a creditor would expect to find in a report filed by a Chapter 11 debtor in possession, namely, the sale of property valued at up to $6,000,000.00 for the price of $76,000.00 four months prior to the petition date.

12. WFLLC's Initial Financial Report did not disclose that WFLLC had already transferred the Williams Farm Property to Steelman. The Initial Financial Report spoke only of an option to purchase involving Geneva Steel Holdings Corp.

13. Because WFLLC's Initial Financial Report failed to disclose the actual purchase price paid by Steelman for the Williams Farm Property and failed to disclose the value of the Williams Farm Property on the date of the sale, it failed to put creditors of WFLLC on inquiry notice.

14. The only information concerning the Williams Farm Property contained in WFLLC's Initial Financial Report spoke of an option to purchase the Williams Farm Property. Because 11 U.S.C. § 363 permits the sale of property other than in the ordinary course of business only after notice and a hearing, the creditors of WFLLC were, at most, put on

notice of the need to monitor WFLLC's bankruptcy proceeding for notice of a hearing seeking authority to sell the Williams Farm Property under 11 U.S.C. § 363.

15. For WFLLC to file a 276 page Initial Financial Report and fail to disclose important and meaningful information regarding the transfer of WFLLC's only significant asset[1], constitutes an active concealment of material information.

16. WFLLC had a duty to disclose the material terms of the transfer of the Williams Farm Property to Steelman in WFLLC's Amended Schedules.

17. The adversary proceeding filed by WFLLC on May 1, 2003 against Atlas Sales, Inc., provides no information disclosing or discussing the value of the Williams Farm Property conveyed to Steelman, and therefore failed to put creditors of WFLLC on inquiry notice.

18. Because WFLLC's Amended Schedules disclose that property was transferred to Steelman for $76,000.00, but does not disclose that the transferred property was worth as much as $6,000,000.00, the Amended Schedules failed to put creditors of WFLLC on inquiry notice.

19. WFLLC's Amended Schedules did not put creditors of WFLLC on inquiry notice that a fraudulent transfer may have taken place.

20. WFLLC's response to question #10 of WFLLC's Amended Statement of Financial Affairs which states "no relationship" is affirmatively misleading.

---

[1] Although the United States Trustee requires that a specific form be submitted, the information that should have been but was not disclosed in WFLLC's Initial Financial Report, can be summarized in two short sentences: "In May 2002, WFLLC transferred its only asset - property known as the Williams Farm Property to Steelman, Inc., for the sale price of $76,000.00. The Williams Farm Property may be worth $3,000,000.00 or more." Instead, WFLLC choose to file a 256 page report that contains outdated and irrelevant information that was generated, for the most part, by a legal entity other than WFLLC.

21. Defendants argue that the all of combined information available from all possible sources, in aggregate, was sufficient to put WFLLC creditors on inquiry notice of the alleged fraudulent transfer of the Williams Farm Property to Steelman, however, when viewing the information as a whole, it is too thin, too attenuated, and is contaminated with repeated doses of misrepresentations and misleading information to put a creditor on inquiry notice.

22. Creditors of the WFLLC bankruptcy proceeding were never put on inquiry notice of the alleged fraudulent transfer of the Williams Farm Property from WFLLC to Steelman.

23. Creditors of WFLLC exercised reasonable and due diligence with respect to the alleged fraudulent transfer of the Williams Farm Property from WFLLC to Steelman.

24. Markus exercised reasonable and due diligence in his capacity as the Chapter 11 trustee of the WFLLC bankruptcy proceeding.

25. Equitable tolling is appropriate in this adversary proceeding.

End of Document